**FILED**

NOV - 1 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

DANNY MILES,

        Defendant.

NO. CR. S-95-325 WBS

MEMORANDUM AND ORDER

----oo0oo----

Defendant Danny Miles is currently on supervised release following his 1996 conviction for possession of a firearm by a convicted felon, 18 U.S.C. § 922(g). Defendant's probation officer directed him to submit a blood sample for deoxyribonucleic acid ("DNA") analysis pursuant to the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. § 14135. Defendant refused to appear for DNA testing, and consequently a petition was filed charging defendant with with a violation of the conditions of his supervised release. Defendant now moves to dismiss the petition. Defendant has otherwise complied with all conditions of his supervised release, and would have successfully completed his term of supervision in August 2002.

1  I.   Factual Background

2        On December 19, 2000, Congress enacted the DNA Analysis

3  Backlog Elimination Act of 2000.   42 U.S.C. § 14135; Pub. L. No.

4  106-546, 114 Stat. 2726 (Dec. 19, 2000)("The Act").   The Act

5  provides, in pertinent part:

6             The probation office responsible for the supervision
            under Federal law of an individual on probation,
7             parole, or supervised release shall collect a DNA
            sample from each such individual who is, or has been,
8             convicted of a qualifying Federal offense (as
            determined under subsection (d)). . . .
9

10  42 U.S.C. § 14135a(a)(2).   "Qualifying federal offenses" are

11  limited to certain categories of violent crime, including

12  homicides, sex offenses, kidnaping, robbery, and conspiracies to

13  commit those offenses.   See 42 U.S.C. § 14135a(d).

14        The Act requires cooperation with the collection of a

15  DNA sample as a condition of supervised release, and makes

16  failure to cooperate a misdemeanor offense.   See 42 U.S.C. §§

17  14135c; 14135a(a)(5).   The Act also authorizes the probation

18  office responsible for the supervision to use reasonable means to

19  detain, restrain, and collect samples from a person who refuses

20  to give them voluntarily.   See 42 U.S.C. § 14135a(a)(4)(A).

21        In addition, the Act requires the probation office to

22  furnish each DNA sample to the Federal Bureau of Investigation

23  for purposes of analysis and indexing in the Combined DNA Index

24  System ("CODIS").   42 U.S.C. § 14135a(b).   CODIS is a national

25  index of DNA samples taken from convicted offenders, crime scenes

26  and victims of crime, and unidentified human remains that

27  "enables law enforcement officials to link DNA evidence found at

28  a crime scene with a suspect whose DNA is already on file."   146

2

1  Cong. Rec. S11645-02, S11647 (Dec. 6, 2000)(statement of Sen.
2  Kohl); see also 42 U.S.C. § 14132(a); 106 H.R. 900.  The Act
3  further authorizes disclosure of a DNA sample or result to
4  "criminal justice agencies for law enforcement identification
5  purposes," in "judicial proceedings," and "for criminal defense
6  purposes, to a defendant."  42 U.S.C. §§ 14135e(a)(b),
7  14132(b)(3).

8         The Act also provides a number of privacy protections,
9  including limiting the use of the information, criminalizing the
10 knowing, unauthorized retention or disclosure of a DNA sample,
11 and expunging a person's DNA records upon proof that each of his
12 convictions for a qualifying offense has been overturned.
13 See id; 42 U.S.C. §§ 14135e(c), 14132(d).

14        In 1974, defendant was convicted of armed robbery,
15 which is considered a "qualifying federal offense" under the Act.
16 28 C.F.R. § 28.2.  He is currently serving a term of supervised
17 release for a 1996 conviction for a non-qualifying federal
18 offense, possession of a firearm by a convicted felon.  Defendant
19 contends that he is not required to submit to DNA testing under
20 the Act because the offense for which he is currently under
21 supervision is not a qualifying offense.  Alternatively,
22 defendant argues that the Act violates the Fourth Amendment, the
23 Equal Protection Clause, and the Ex Post Facto Clause.

24 II.  Discussion

25       A.  Interpretation of 42 U.S.C. § 14135a(a)(2)

26       Whether the Act applies to defendant depends on what
27 the meaning of "has been" is.  The Act requires the probation
28 office to collect a DNA sample from any individual on supervised

1  release "who is, or has been, convicted of a qualifying Federal
2  offense."  42 U.S.C. § 14135a(a)(2).  Defendant interprets this
3  provision to mean that DNA sampling is required of a supervisee
4  who "is or has been" convicted of a qualifying offense, and is
5  now under supervision for that offense.  The government contends
6  that the terms of the Act require testing of any supervisee who
7  "is or has been" convicted of a qualifying offense, regardless of
8  whether his current supervision is the result of his conviction
9  for the qualifying offense.

10         The question of whether section 14135a(a)(2) covers
11  people like defendant who are currently under supervision for a
12  non-qualifying offense but who have been convicted of a
13  qualifying offense in the past appears to be a matter of first
14  impression.  The court's analysis therefore begins, as it must,
15  with the language of the statute itself.  Lewis v. United States,
16  445 U.S. 55, 60 (1980); Tello v. McMahon, 677 F. Supp. 1436, 1441
17  (E.D. Cal. 1988)(if there is no binding authority construing
18  statute, the court must undertake its own independent analysis
19  beginning with examination of statutory text).

20         If the language of the statute is clear and
21  unambiguous, it must ordinarily be regarded as conclusive.  North
22  Dakota v. United States, 460 U.S. 300, 312 (1983).  In the
23  absence of textual ambiguity, the court may resort to other
24  cannons of statutory construction only if there is "[v]ery strong
25  evidence, if not explicit language from the legislative history"
26  of Congressional intent contrary to the statute's plain meaning.
27  Tello, 677 F. Supp. at 1441; Burlington N. R.R. Co. v. Oklahoma
28  Tax Comm'n, 481 U.S. 454, 461 (1987); Dickerson v. New Banner

4

1  Inst., Inc., 460 U.S. 103, 110 (1983).

2       The language of section 14135a(a)(2) is plain.  It
3  applies without limitation or qualification to any person on
4  supervised release who "is or has been convicted of a qualifying
5  Federal offense."  So long as the person is (1) under
6  supervision, and (2) has been convicted of a qualifying offense,
7  he must submit to DNA testing.  Nothing on the face of the
8  statute suggests a Congressional intent to restrict the Act's
9  application only to people who have been convicted of a
10 qualifying offense for which they are now under supervision.  To
11 arrive at the construction defendant urges, the court would have
12 to insert a limitation into the statute that does not appear in
13 its text.  See Burlington Northern, 481 U.S. at 463
14 ("Respondents' position depends upon the addition of words to a
15 statutory provision which is complete as it stands.  Adoption of
16 their view would require amendment rather than construction of
17 the statute, and it must be rejected here.")

18       Lewis v. United States, 445 U.S. 55 (1980) is
19 instructive on this point.  The Supreme Court in Lewis construed
20 a federal statute prohibiting any person who "has been convicted
21 by a court of the United States or of a State . . . of a felony"
22 from possessing a firearm.  The Supreme Court rejected the
23 defendant's argument that the statute did not apply to felony
24 convictions subject to collateral attack:

25            [The statute's] proscription is directed unambiguously
26            at any person who "has been convicted by a court of the
             United States or of a State. . . of a felony."  No
             modifier is present, and nothing suggests any
27            restriction on the term "convicted."  Nothing on the
             face of the statute suggests a congressional intent to
28            limit its coverage to persons [whose convictions are

1
2

                    not subject to collateral attack].  The statutory
                    language is sweeping . . . .

3  Id. at 60-61.

4          The "has been convicted" language in section
5  14135a(a)(2) is similarly sweeping and unqualified.  It carves
6  out no exceptions, and it would be contrary to the plain meaning
7  of the statute to recognize an exception in defendant's case.[1]

8          Defendant argues that the legislative history must
9  inform the court's analysis.  Defendant contends that because
10 Congress appears not to have raised or debated the question of
11 whether DNA testing would be required based on a prior
12 conviction, Congress "[cannot have] intended that the DNA
13 collection provision would be applied on the basis of past
14 criminal history."  (Def's Brief at 8.)  However, "[t]he facile
15 attribution of Congressional 'forgetfulness' cannot justify . . a
16 usurpation" by the judicial branch of Congress's legislative
17 role.  West Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83,
18 99-100 (1991).  The text of the Act itself is the best evidence
19 of Congress's intent, id., and the text provides for DNA testing
20 regardless of when the qualifying offense occurred.  Moreover,
21 there is no evidence, let alone "very strong evidence" that
22 Congress's intent was contrary to the plain meaning of the Act.

23

24         [1]   Defendant makes much of the fact that the statute does
25 not contain any reference to prior convictions or prior criminal
   history.  However, this does not make section 14135a(a)(2)
26 ambiguous.  Ambiguity exists if "a statute is capable of being
   understood by reasonably well informed persons in two or more
27 different senses."  Sutherland, Statutory Construction § 45.02 at
   6 (5th ed. 1992).  Section 14132a(a)(2) by its terms
28 unambiguously encompasses prior convictions for qualifying
   offenses, because its terms are not limited in any way.

                                 6

1 <u>Tello</u>, 677 F. Supp. at 1441.  This is not one of those
2 "exceptional circumstances" in which the legislative history
3 evidences a Congressional intent so inconsistent with the plain
4 meaning of the statute that the court may resort to other cannons
5 of statutory construction to adopt a different interpretation.
6 <u>Burlington Northern</u>, 481 U.S. at 461.

7          Defendant also urges the court to construe the Act so
8 as to avoid constitutional questions, but "that course is
9 appropriate only where the statute provides a fair alternative
10 construction."   <u>Lewis</u>, 445 U.S. at 65.  Because section
11 14135a(a)(2) is unambiguous on its face, there is no
12 justification for construing the statute in light of
13 constitutional considerations.  The plain language of the Act
14 dictates that defendant must submit a DNA sample as a condition
15 of his supervised release.[2]

16          B.    Fourth Amendment

17          Defendant alternatively contends that the Act, if
18 applied to him, is unconstitutional under the Fourth Amendment
19 because it requires him to submit to a blood test without any
20 individualized suspicion that he has engaged in criminal
21 wrongdoing other than the offense for which he has already been
22 convicted.  For the reasons that follow, the court agrees.

23

24          [2]    The court's conclusion is bolstered by the fact that
25 the Administrative Office of the United States Courts has
    interpreted the Act to apply to "any offender who has a previous
26 federal conviction for any of the qualifying offenses. . . ."
    (Dec. 14, 2001 Mem. From Administrative Office of the United
27 States Courts to All Chief Probation Officers.)  Where there is
    ambiguity in the text of a statute, the administrative
28 interpretation of the statute is entitled to "great deference."
    <u>Udall v. Tallman</u>, 380 U.S. 1, 16 (1965).

                                7

1      It is well settled that taking a blood sample
2  constitutes a search under the Fourth Amendment.  Skinner v.
3  Railway Labor Executives Ass'n, 489 U.S. 602, 616 (1989).  The
4  question in this case is whether the non-consensual extraction of
5  blood from defendant for DNA testing under the Act is reasonable,
6  "for the Fourth Amendment does not proscribe all searches and
7  seizures, but only those that are unreasonable."  Id. at 619.[3]

8      In Rise v. Oregon, 59 F.3d 1556 (9th Cir. 1995), the
9  Ninth Circuit considered the constitutionality of a similar
10  statute and found that it did not violate the Fourth Amendment.
11  At issue in Rise was an Oregon statute requiring convicted
12  murderers and sex offenders to submit to blood testing for DNA
13  analysis.  At the outset, the Ninth Circuit rejected the
14  petitioners' argument that because the purpose of Oregon's DNA
15  statute was general law enforcement, probable cause or at least
16  individualized suspicion was required for the search to be
17  reasonable.  Citing Michigan State Police Department v. Sitz, 496
18  U.S. 444, 450 (1990), the Ninth Circuit emphasized that "[e]ven
19  in the law enforcement context, the State may interfere with an
20  individual's Fourth Amendment interests with less than probable
21  cause and without a warrant if the intrusion is only minimal and
22  is justified by law enforcement purposes."  Id. at 1559.

23

24      [3]      The Act does not preclude the use of means other than
25  blood testing to obtain a sample of a convicted felon's DNA.  The
    Act requires the collection of a "DNA sample," which is defined
26  as "a tissue, fluid or other bodily sample of an individual on
    which DNA analysis can be carried out."  42 U.S.C. §
27  14135a(c)(1).  Because defendant was specifically directed to
    submit to blood testing, the court is not called upon to express
28  any opinion on the constitutionality of other means of collecting
    DNA samples under the Act.

1       Accordingly, the Ninth Circuit went on to examine the
2  intrusiveness of the search and the justifications for the
3  search.  It found that although drawing blood from "free persons"
4  would generally require a warrant supported by probable cause,
5  convicted felons as a class "do not have the same expectations of
6  privacy in their identifying genetic information," because once
7  convicted of a predicate offense, "[their] identity has become a
8  matter of state interest and [they] have lost any legitimate
9  expectation of privacy in the identifying information derived
10 from the blood sampling."  Id. at 1559-60.  Because of the
11 convicted felon's reduced expectation of privacy, and because
12 drawing blood "constitutes only a minimally intrusive search,"
13 the Ninth Circuit found that it was appropriate to abandon the
14 normal requirement of probable cause as well as the lesser
15 requirement of individualized suspicion, "even if [the statute's]
16 only objective is law enforcement."  Id. at 1560; 1559.

17      Instead, the Ninth Circuit applied a balancing test in
18 which it weighed "the gravity of the public interest served by
19 the creation of a DNA data bank, the degree to which the data
20 bank would advance the public interest, and the severity of the
21 resulting interference with individual liberty."  Id. at 1560.
22 It found that a DNA bank was likely to advance the state's
23 interests in solving crimes, in prosecuting crimes accurately,
24 and in reducing recidivism.  Id. at 1561.  It also concluded that
25 the infringement on convicted felons' liberty was minimal by
26 comparison because the statute applied only to a limited class of
27 offenders, it required no more than one blood extraction in a
28 person's lifetime, sampling was to be done only by medical

9

1 personnel and the samples could only be used in judicial
2 proceedings and by certain law enforcement officers, the statute
3 prohibited the state from analyzing the samples to discover
4 genetic predispositions to physical or mental conditions, and it
5 was applied evenhandedly.  Id. at 1561-66.  Accordingly, the
6 Ninth Circuit ruled that Oregon's DNA statute was constitutional
7 under the Fourth Amendment.  Id. at 1562.

8           The government contends that Rise controls the
9 court's decision in this case.  Were it not for two more recent
10 Supreme Court decisions, this court would be inclined to agree.
11 However, the Supreme Court in City of Indianapolis v. Edmond, 531
12 U.S. 32 (2000) and Ferguson v. City of Charleston, 532 U.S. 67
13 (2001) effectively overruled Rise.

14           In Edmond, the Court held that programmatic
15 suspicionless searches cannot, as a general rule, be justified
16 primarily by reference to general law enforcement needs.
17 Edmond examined the constitutionality of Indianapolis's highway
18 checkpoint program, which had as its primary purpose the
19 discovery and interdiction of illegal narcotics.  The Court
20 "declin[ed] to suspend the usual requirement of individualized
21 suspicion where the police seek to employ a checkpoint primarily
22 for the ordinary enterprise of investigating crimes."  Edmond,
23 531 U.S., at 43.  The Court observed:

24                [T]he gravity of the threat alone cannot be dispositive
25           of questions concerning what means law enforcement
             officers may employ to pursue a given purpose.  Rather,
26           in determining whether individualized suspicion is
             required, we must consider the nature of the interests
27           threatened and their connection to the particular law
             enforcement practices at issue.  We are particularly
28           reluctant to recognize exceptions to the general rule
             of individualized suspicion where governmental

                                  10

1
2
> authorities primarily pursue their general crime
> control ends.

3  Id. at 42-43 (emphasis added).

4           In finding the Indianapolis checkpoint
5  unconstitutional, the Court distinguished a number of other cases
6  in which it had upheld programs of suspicionless searches on the
7  grounds that those programs were all justified by reference to
8  objectives other than ordinary law enforcement.  See id. at 37-40
9  (citing cases.)  Significantly, the Court explained that Michigan
10 State Police Department v. Sitz, the case on which the Ninth
11 Circuit relied to justify its departure from the usual
12 individualized suspicion requirement, does not stand for the
13 proposition that law enforcement needs can validate a program of
14 suspicionless searches.  According to Edmond, Sitz properly
15 upheld a sobriety checkpoint program as constitutional not
16 because the program was well-tailored to serve a law enforcement
17 purpose, but because its primary objective was promoting highway
18 safety by "reducing the immediate hazard posed by the presence of
19 drunk drivers on the highways."  Id. at 39.  The Court also
20 distinguished Skinner v. Railway Labor Executives Association,
21 489 U.S. 602 (1989), another case on which the Ninth Circuit
22 relied for its "balancing test," on the grounds that the program
23 of drug and alcohol testing for railroad employees at issue in
24 that case was related to the "special need beyond the normal need
25 for law enforcement" of enforcing railroad safety regulations.
26 Id. at 36.

27          Thus, in Edmond, the Supreme Court flatly rejected
28 Rise's interpretation of Sitz and Skinner, and refused as a

                              11

1 general rule to "credit the 'general interest in crime control'
2 as justification for a regime of suspicionless [searches]." Id.
3 at 42. The Court appeared to be willing to make an exception
4 only where "some emergency" related to ordinary crime control
5 might justify a program of stops or searches without
6 individualized suspicion, such as a roadblock set up to thwart an
7 imminent terrorist attack, or to stop a fleeing, dangerous
8 criminal. Id. at 44.

9          Rise was further undermined by the Supreme Court's
10 decision in Ferguson, 532 U.S. 67. The Court in Ferguson struck
11 down a hospital program in which hospital staff tested pregnant
12 women for drug use and then turned the test results over to the
13 police for use against the women in subsequent criminal
14 prosecutions. The Court held that although the ultimate
15 objective of the program was to deter drug use among pregnant
16 women, the program was unconstitutional under the Fourth
17 Amendment because its immediate objective was to generate
18 evidence for law enforcement purposes. Id. at 83. Ferguson thus
19 reiterates Edmond's skepticism over the validity of a program of
20 suspicionless searches where the government's asserted need is
21 its general interest in law enforcement. See id. at n.20 (noting
22 that "[i]n none of our previous special needs cases have we
23 upheld the collection of evidence for criminal law enforcement
24 purposes.")

25          In addition, Ferguson casts doubt on the Ninth
26 Circuit's suggestion in Rise that it is appropriate to depart
27 from the requirement of individualized suspicion because
28 convicted felons as a class have a lesser expectation of privacy.

1 In Ferguson, the Court took pains to distinguish Griffin v.
2 Wisconsin, 483 U.S. 868 (1987), which held that special needs
3 justified the warrantless search of a probationer's home based on
4 less than probable cause.  Id. at 79 n.15.  The Court declined to
5 interpret Griffin as upholding a special needs search that was
6 directed toward general law enforcement:

7          The dissent, . . . relying on Griffin, argues that the
           special needs doctrine is 'ordinarily employe[d],
8          precisely to enable searches by law enforcement
           officials who, of course, ordinarily have a law
9          enforcement objective.'  Viewed in the context of our
           special needs cases and even viewed in isolation,
10         Griffin does not support the proposition for which the
           dissent invokes it.
11

12 Id. (internal citations omitted)(emphasis in original).

13         The Court in Ferguson suggested that Griffin is
14 properly analyzed as holding that the search of the probationer's
15 home was justified by reference to the special non-law
16 enforcement needs of the probation system.  Although the Court
17 also mentioned that probationers have a lesser expectation of
18 privacy than free persons generally, it distinguished Griffin
19 primarily on the ground that the search in that case was
20 justified by a purpose other than ordinary law enforcement.
21 Thus, even in the context of probationers who have a lesser
22 expectation of privacy because of their status, the Supreme Court
23 has gone to great lengths to require something more than the
24 assertion of a general law enforcement need to justify a regime
25 of suspicionless searches.[4]

26
_____

27      [4]   Edmond is in accord.  It is axiomatic that people have
28 a lesser expectation of privacy in their cars, see Carroll v.
   United States, 267 U.S. 132, 153 (1925), yet under Edmond there

13

1    This court is aware of no Supreme Court case upholding
2  a suspicionless search of inmates, probationers, or supervisees
3  where the justification for the search was primarily law
4  enforcement.  The Court has justified such searches by reference
5  to the government's interest in institutional security, order,
6  and discipline, but never by reference to the government's law
7  enforcement objectives.  See Bell v. Wolfish, 441 U.S. 520, 559-
8  60 (1979)(routine searches of jail cells and body cavities
9  appropriate because of strong interest in prison security);
10 Griffin, 483 U.S. at 875 (warrantless search of probationer's
11 home justified on less than probable cause because of goals of
12 probation system, including need for supervision and discipline);
13 see also Ferguson, 532 U.S. at 67 ("The traditional warrant and
14 probable cause requirements are waived in our previous cases on
15 the explicit assumption that the evidence obtained in the search
16 is not intended to be used for law enforcement purposes")
17 (Kennedy, J. concurring).[5]

18    Accordingly, the government cannot avoid the import of
19 Edmond and Ferguson by making the facile argument that those

20
21 still must ordinarily be individualized suspicion before they can
   be subjected to a car stop for general law enforcement purposes.

22    [5]    The government contends that Ferguson does not
23 undermine Rise because Ferguson applied a "special needs" test,
   while Rise applied a Fourth Amendment balancing test.  Ferguson
24 is important not because of the test it applied, but because it
   supports the proposition that individualized suspicion is usually
25 required in the context of searches conducted for general law
   enforcement purposes, even when the person being searched has a
26 lesser expectation of privacy because of his status. In addition,
   it is not at all clear that Rise applied a Fourth Amendment
27 balancing test as opposed to a "special needs" test.  At least
   one lower court has interpreted Rise as having applied a "special
28 needs" test.  See United States v. Reynard, 2002 WL 1988176, No.
   98-CR-2402-IEG (Aug. 26, 2002).

14

1   cases involved searches and seizures of free persons, while the
2   searches in Rise and in this case involve convicted felons.
3   Moreover, the notion expressed in Rise that persons convicted of
4   qualifying offenses have no expectation of privacy in their
5   identifying information has little application to defendant, who
6   was convicted of a qualifying offense nearly thirty years ago and
7   has fully served his sentence for that crime.   Unlike defendant,
8   the petitioners in Rise were under supervision for their
9   qualifying offenses.   Thus, they had more reason to expect that
10  while they were under supervision they would be required to
11  comply with conditions related to their qualifying offenses.
12  Here, by contrast, there is no connection between defendant's
13  current supervised release and his 1974 conviction for the
14  qualifying offense.

15          The court cannot accept the government's argument that
16  defendant's expectation of privacy was obliterated forever when
17  he was convicted of a qualifying offense thirty years ago.
18  Having fully served his sentence for that crime, defendant had an
19  objectively reasonable expectation that after three decades the
20  government would not be able to use that offense as a
21  justification for invading his bodily integrity and obtaining his
22  identifying information without some individualized suspicion of
23  criminal wrongdoing.

24          The government next contends that Edmond and Ferguson
25  have no application to this case because the DNA Act has a
26  broader primary purpose than just uncovering evidence of ordinary
27  criminal wrongdoing.   Specifically, the government argues that
28  the Act has the following objectives: (1) investigation and

15

1 prosecution of past and future crimes; (2) ensuring the more
2 accurate prosecution of crimes, for example by exonerating the
3 innocent; and (3) preventing recidivism.

4     To determine the actual primary purpose of the Act, the
5 court is not compelled to accept the government's retrospective
6 justifications, but rather must examine all the available
7 evidence.  Edmond, 531 U.S. at 46-47. Thus, the court examines
8 each of the asserted governmental interests to determine whether
9 such interest is in fact an actual primary purpose of the Act
10 and, if so, whether that interest can be distinguished from law
11 enforcement.

12     The government's first asserted interest, the
13 investigation and prosecution of crimes, is no different from a
14 general law enforcement purpose.  Much like the program struck
15 down by the Supreme Court in Ferguson, the Act authorizes test
16 results to be given to law enforcement officials and to be used
17 in prosecutions.  In fact, the Act's express purpose is to gather
18 information for use in the CODIS database, which is designed to
19 match felons' DNA information to DNA found at crime scenes.[6]
20 Thus, the Act is specifically directed toward gathering evidence

21

22     [6]     In United States v. Reynard, 2002 WL 1988176 No. 98-
CR-2402-IEG (S.D. Cal. Aug. 26, 2002) the court held that the
23 purpose of expanding the CODIS database goes beyond normal law
enforcement needs.  The court finds Reynard unpersuasive on this
24 point.  CODIS was expressly created to solve crime, as
acknowledged in the legislative history of the Act.  See 146
25 Cong. Rec. H8572-01, *H8575-6 ("The purpose of this database is
to match DNA samples from crime scenes where there are no
26 suspects with the DNA of convicted offenders.  Clearly, the more
samples we have in the system, the greater the likelihood we will
27 come up with matches and solve cases.")  It is intellectually
dishonest to decouple the collection of information for use in
28 CODIS from the law enforcement purpose for which CODIS was
created.

16

to be used in solving and prosecuting crimes, which is clearly a law enforcement purpose.

The government's second asserted interest, advancing the accurate prosecution of crimes, does not withstand scrutiny. If a convicted felon wants to be exonerated of a crime for which he is wrongly accused, he will presumably submit voluntarily to a DNA test.  The Act, however, compels convicted felons under supervision to give samples of their DNA against their will, and even authorizes the use of force or restraint to gather a DNA sample if they do not cooperate.  It is disingenuous for the government to state that it needs to exonerate people who do not want to be exonerated.

In any case, the asserted interest in prosecuting crimes accurately is indistinguishable from the government's basic interest in enforcing the law.  Any time the government attempts to solve or prosecute crime, the presumption is that the government's objective is to do so accurately.  The accurate prosecution of crime is an inherent and implicit goal of the government's ordinary law enforcement objective.

Moreover, as a practical matter, there is no material difference between furthering law enforcement objectives and advancing the government's interest in accurate criminal prosecution.  Defendant's DNA sample may demonstrate that he is innocent of a crime, but, like a good alibi, the sample would only eliminate him from the field of suspects under investigation.  Alternatively, defendant's DNA sample may later prove that someone else is innocent of a crime, but only by providing evidence of defendant's guilt.  Thus, the asserted

17

1  interest in accurate prosecution is nothing more than the other
2  side of the same law enforcement coin.  The purpose served by the
3  Act is "ultimately indistinguishable from the general interest in
4  crime control."  Edmond, 531 U.S. at 45.

5        Finally, the government's third asserted interest,
6  reducing recidivism, is collateral to the law enforcement
7  purposes of the Act.  The legislative history of the Act reflects
8  that Congress was overwhelmingly concerned with expanding the
9  CODIX database to promote accurate crime solving and prosecution,
10  not with deterring convicted felons from committing crime in the
11  future. See 146 Cong. Rec. H8572-01, at *H8574-H8575; H.R. Rep.
12  106-900(I), at *8-11; 23-27; 32-36.  Any time the government
13  implements a program requiring people to give evidence that may
14  later be used against them in a criminal prosecution, the program
15  may have a deterrent effect.  See Ferguson, 532 U.S. at 83
16  (noting that "law enforcement involvement always serves some
17  broader social purpose or objective"); Edmond, 531 U.S. at 43
18  ("The detection and punishment of almost any criminal offense
19  serves broadly the safety of the community").  However, those
20  positive externalities are insufficient as a matter of law to
21  take the program out of the realm of searches having a primary
22  purpose of general law enforcement.  See Ferguson, 532 U.S. at
23  83; Edmond, 531 U.S. at 43.

24        Under Ferguson, a program of suspicionless searches
25  cannot be justified by its ultimate purpose or effect of
26  deterring harmful behavior if its immediate purpose is to gather
27  evidence for use in investigating and prosecuting crime.
28  Ferguson, 532 U.S. at 83 (finding hospital's policy of drug

18

1   testing pregnant women unconstitutional where "[t]he threat of
2   law enforcement may ultimately have been intended as a means to
3   an end [of getting women into substance abuse treatment and off
4   drugs], but the direct and primary purpose of [the] policy was to
5   ensure the use of those means.")  Because the Act authorizes
6   suspicionless searches primarily for general law enforcement
7   purposes, it is unconstitutional.[7]

8           The authorities cited by the government do not compel a
9   different conclusion.  The government cites a number of cases
10  upholding DNA testing statutes under the Fourth Amendment, but
11  none of those cases are binding on this court.  All but three of
12  those cases were decided before Edmond and Ferguson and therefore
13  have no continued validity, for the reasons discussed above.  See
14  Roe v. Marcotte, 193 F.3d 72 (2d Cir. 1999) (upholding
15  Connecticut statute before Edmond and Ferguson decided); Boling
16  v. Romer, 101 F.3d 1336 (10th Cir. 1996) (upholding Colorado
17  statute under Fourth Amendment); Jones v. Murray, 962 F.2d 302
18  (4th Cir. 1992)(finding Virginia DNA statue constitutional under
19  Fourth Amendment); Kruger v. Erickson, 875 F. Supp. 583, 588 n.6
20  (D. Minn. 1995)(Minnesota statute upheld); Vanderlinden v.
21  Kansas, 874 F. Supp. 1210, 1214-15 (D. Kan. 1995) (Kansas statute
22  upheld); Ryncarnz v. Eikenberry, 824 F. Supp. 1493, 1499 (E.D.
23  Wash. 1993)(upholding Washington statute).

24          Further, none of the three cases decided after Edmond

26          [7]   Because the court finds that the Act, as applied to
27  defendant, is unconstitutional under the Fourth Amendment, the
    court does not address defendant's arguments that requiring him
28  to submit a DNA sample would violate the Equal Protection Clause
    or Ex Post Facto Clause.

                                    19

1    and Ferguson are persuasive.  See United States v. Reynard, 2002
2    WL 1988176 No. 98-CR-2402-IEG (S.D. Cal. Aug. 26, 2002)(holding,
3    post Edmond and Ferguson, that the DNA Analysis Backlog
4    Elimination Act of 2000 does not violate the Fourth Amendment);
5    United States v. Meier, CR No. 97-72 HA, slip op. at 8-9 (D. Or.
6    Aug. 6, 2002)(same); Groceman v. United States Dept. of Justice,
7    2002 WL 1398559, No. Civ. 301CV1619G (N.D. Tex. June 26,
8    2002)(same).  Two of those cases, United States v. Meier, CR No.
9    97-72 HA, slip op. at 8-9 (D. Or. Aug. 6, 2002), and Groceman v.
10   United States Dept. of Justice, 2002 WL 1398559, No. Civ.
11   301CV1619G (N.D. Tex. June 26, 2002), do not discuss the import
12   of either Edmond or Ferguson.  Rather, Meier and Groceman simply
13   follow circuit court precedent with little or no independent
14   analysis, and therefore are not particularly persuasive or useful
15   here.[8]

16        The only case of which the court is aware that
17   discusses the significance of Edmond and Ferguson in the context
18   of DNA testing is United States v. Reynard, 2002 WL 1988176 No.
19   98-CR-2402-IEG (S.D. Cal. Aug. 26, 2002).  There, Judge Gonzalez
20   found the DNA Analysis Backlog Elimination Act of 2000
21   constitutional under the Fourth Amendment.  Importantly, Judge
22   Gonzalez reasoned that in light of Ferguson, the court could not
23   undertake the kind of balancing employed in Rise without first
24   determining whether the Act could be justified by reference to a
25   purpose other than ordinary law enforcement.  Id. at *18, *20
26   ("The Court must first determine whether the DNA Act authorizes

27

28        [8]    In addition, Meier is an unpublished order and
     therefore carries no weight.

searches that go beyond the normal need for law enforcement.")
Judge Gonzalez concluded that <u>Rise</u> did "not control the
disposition" of the case because "[<u>Rise</u>'s statement] that the
Oregon statute was constitutional 'even if its only objective is
law enforcement,' <u>Rise</u>, 59 F.3d at 1559 . . . potentially
conflicts with recent Supreme Court decisions suggesting that a
statute will not fall within the 'special needs' exception if the
statute's 'primary purpose' is the investigation of crimes."   <u>Id.</u>
at *21 n.29 (citing <u>Ferguson</u>, 532 U.S. 67, 80-85.)

        Thus, while the ultimate result in <u>Reynard</u> is at odds
with the result this court reaches today, <u>Reynard</u> is consistent
with the notion that it is impermissible to justify a regime of
suspicionless searches primarily by reference to normal law
enforcement needs.   The only difference between <u>Reynard</u> and the
court's decision here is that in <u>Reynard</u> the court concluded that
the Act's goals of ensuring accurate prosecution and creating a
more complete DNA database were distinct from general law
enforcement objectives.   <u>See id.</u> at *20-21.   For the reasons
discussed above, this court concludes otherwise.

III.   Conclusion

        Defendant had served almost the full term of his
supervised release without incident until he refused to submit a
blood sample for DNA testing.   This court, in the process of
performing its supervisory function, was then asked to assist the
government in gathering evidence for law enforcement purposes
which have no relation to the purposes of supervised release.
<u>See</u> <u>United States v. Vallejo</u>, 69 F.3d 992, 994 (9th Cir.
1995)(stating that the purpose of supervised release is to

1  protect the public and to facilitate the reintegration of
2  defendants into the community).

3      The government has been unable to point to any primary
4  purpose of the DNA Analysis Backlog Elimination Act of 2000, and
5  the record before this court supports a finding of none, other
6  than its use as a general law enforcement tool.  This runs afoul
7  of Edmond and Ferguson.  It is a violation of defendant's Fourth
8  Amendment rights to require him, without any individualized
9  suspicion, to submit a blood sample under the Act.

10      IT IS THEREFORE ORDERED that defendant's motion to
11  dismiss the petition charging violation of the conditions of
12  supervised release be, and the same hereby is, GRANTED.

13  DATED: October 31, 2002

14                          WILLIAM B.  SHUBB
15                          UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

22

United States District Court
for the
Eastern District of California
November 1, 2002


* * CERTIFICATE OF SERVICE * *


2:95-cr-00325


USA

   v.

Miles

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  November 1, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


Thomas Hopkins                          SH/WBS
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Allison Claire
Federal Defender
801 K Street
Suite 1024
Sacramento, CA  95814


SERVICE BY INTER OFFICE:

FD      US MARSHAL        PROBATION      PRETRIAL  SERVICES        CHAMBERS


Jack L. Wagner, Clerk

BY: _____
Deputy Clerk